The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
January 2, 2020

## 2020COA5

**No. 19CA0198, *People in the Interest of S.B.* — Juvenile Court — Dependency and Neglect — Termination of the Parent-Child Legal Relationship; Attorneys and Clients — Ineffective Assistance of Counsel**

A division of the court of appeals considers whether the juvenile court erred in terminating father's parental rights.

In separate opinions, Judges Hawthorne, Furman and Navarro conclude that the court did not err. Judge Hawthorne, writing for the majority, concludes that under *People in Interest of A.G.*, 262 P.3d 646 (Colo. 2011), a parent's ineffective assistance of counsel claim in a termination proceeding requires demonstrating "outcome-determinative" prejudice pursuant to *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Judge Furman specially concurs, pointing out the shortcomings of applying the criminal "outcome-determinative" prejudice inquiry to civil termination of

parental rights proceedings. Judge Navarro specially concurs that

father failed to demonstrate prejudice under either analysis.

COLORADO COURT OF APPEALS **2020COA5**

Court of Appeals No. 19CA0198
Montrose County District Court No. 17JV83
Honorable D. Cory Jackson, Judge

The People of the State of Colorado,

Appellee,

In the Interest of S.B., a Child,

and Concerning R.B.,

Appellant.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE HAWTHORNE
Furman, J., specially concurs
Navarro, J., specially concurs

Announced January 2, 2020

Julie R. Andress, Assistant County Attorney, Montrose, Colorado, for Appellee

Barbra J. Remmenga, Guardian Ad Litem

Michael Kovaka, Littleton, Colorado, for Appellant

¶ 1    In this dependency and neglect proceeding, R.B. (father) appeals the judgment terminating his parental rights to S.B. (the child).  We affirm.

## I.    Factual Background and Procedural History

¶ 2    In August 2017, law enforcement officials placed the child in protective custody because during a drug raid they found the child alone in unsafe conditions where he and father lived.  The Montrose County Department of Health and Human Services (Department) initiated a dependency and neglect proceeding, and the juvenile court granted custody of the child to the Department.  The Department placed the child in the care of his paternal great aunt and uncle, whom the court appointed as special respondents in the case.  The child's mother had died earlier that year.

¶ 3    In September 2017, father admitted that the child was dependent and neglected and the court adopted a treatment plan for father.

¶ 4    Father was later arrested on several offenses, and under a plea agreement was sentenced to six years in the custody of the Department of Corrections in March 2018.

¶ 5     In August 2018, the Department moved to terminate father's parent-child legal relationship with the child.  The court held a termination hearing and terminated father's parental rights.

II.     *The Juvenile Court's Errors Under ICWA Were Harmless*

¶ 6     Father contends that the juvenile court failed to comply with the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963 (2018), in two ways: (1) it failed to make proper ICWA inquiries during the termination proceeding and (2) it and the Department failed to send proper notice of the termination proceeding to the Jena Band of the Choctaw Tribe.  We conclude the errors in the court's inquiry and notice procedures under ICWA were harmless.

A.     *Standard of Review and Applicable Law*

¶ 7     We review de novo whether ICWA's requirements applied to the proceeding and were satisfied.  *People in Interest of M.V.*, 2018 COA 163, ¶ 32; *People in Interest of T.M.W.*, 208 P.3d 272, 274 (Colo. App. 2009).

¶ 8     Colorado's ICWA-implementing legislation provides that in dependency and neglect proceedings, the petitioning party must make continuing inquiries to determine whether the child is an

2

Indian child.  § 19-1-126(1)(a), C.R.S. 2018;[1] *see also B.H. v. People in Interest of X.H.*, 138 P.3d 299, 302 (Colo. 2006).

¶ 9      The federal guidelines implementing ICWA impose a duty of inquiry and notice on trial courts.  25 C.F.R. § 23.107(a) (2019); Bureau of Indian Affairs, Guidelines for Implementing the Indian Child Welfare Act (Dec. 2016), https://perma.cc/3TCH-8HQM; *see also* Notice of Guidelines, 81 Fed. Reg. 96,476 (Dec. 30, 2016).  The court must ask each participant on the record at the beginning of every emergency, voluntary, or involuntary child custody proceeding whether the participant knows or has reason to know that the child is an Indian child.  25 C.F.R. § 23.107(a); *see People in Interest of L.L.*, 2017 COA 38, ¶ 19.  A proceeding to terminate parental rights is a separate child custody proceeding under ICWA.  *See* 25 U.S.C. § 1903(1) (2018); *see also* § 19-1-126(1); *People in Interest of C.A.*, 2017 COA 135, ¶ 10.

¶ 10      When there is reason to know or believe that a child involved in a custody proceeding is an Indian child, the petitioning party must send notice of the proceeding to the potentially concerned

---

[1] The statute in effect at the time.

tribe or tribes. *B.H.*, 138 P.3d at 302; *see* 25 U.S.C. § 1912(a) (2018); § 19-1-126(1)(b). A court "has reason to know" a child is an Indian child if, in relevant part, "[a]ny participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that the child is an Indian child . . . [or] informs the court that it has discovered information indicating that the child is an Indian child[.]" 25 C.F.R. § 23.107(c). State courts and agencies are encouraged to interpret these factors expansively. *M.V.*, ¶ 43. If the tribe's identity or location can't be determined, notice must be given to the Bureau of Indian Affairs. *B.H.*, 138 P.3d at 302; *see* 25 U.S.C. § 1912(a).

### B.    *Additional Facts*

¶ 11     Prior to the dependency and neglect adjudication, the court asked father on two occasions whether the child had Indian heritage. Father said that the child didn't and that he was unaware of any Indian heritage from the child's mother.

¶ 12     At the adjudication hearing, the Department notified the court that it was inquiring into the child's possible Indian heritage from his mother.

¶ 13    Months later at a review hearing, the Department updated the court on its efforts to determine the child's possible Indian heritage. Its counsel said that the Department had communicated with the child's maternal grandfather, who said that he was a registered member of a Choctaw tribe. Counsel said that the Department had sent notices to the three federally recognized Choctaw tribes, and that two had responded that the grandfather wasn't a member or eligible to be one. The Department hadn't heard back from the third tribe, the Jena Band, and hadn't been able to contact the tribe by telephone.

¶ 14    In July 2018, the court held a "permanency planning hearing." It adopted the Department's primary termination and adoption plan. The court found that "ICWA continues not to be an issue," and that it "does not know or have reason to know that [the child] is [an] Indian child."

¶ 15    On August 1, 2018, the Department moved to terminate father's parent-child legal relationship with the child. In the motion, the Department stated that it

> made appropriate inquiries to determine that
> [the child is] not subject to [ICWA]. . . .
> Inquiries were made into the [m]other's

> heritage and the Choctaw Tribes were noticed. The People do not know or have reason to know or believe that the child is an Indian Child under the meaning of [ICWA].

¶ 16 On August 15, 2018, in a "pre-hearing" order, the court stated that it "hereby inquires of [father] whether [he] or the child[] are members of a Native American Indian tribe or are eligible for membership in a Native American Indian tribe. [Father] shall file a report indicating whether ICWA is a[n] issue in this case within [seven] days." Father didn't respond.

¶ 17 Eight days before the termination hearing on November 6, 2018, the Department filed a "Notice Regarding [ICWA]." In the notice the Department detailed its efforts to inquire into the child's possible Indian heritage, including what counsel had already provided at the review hearing. The Department also sent information to the Bureau of Indian Affairs, but the Bureau had responded that it couldn't identify a tribe. The Jena Band of the Choctaw Tribe still hadn't responded to the notice or to the Department's follow-up efforts.

¶ 18 The notice also said that the Department had called grandfather in July 2018 prior to the termination motion, and he

6

had "confirmed that the tribe he is enrolled in is the 'Metis' tribe," a federally unrecognized tribe. Thus, the Department concluded that it didn't believe or have reason to know that the child was an Indian child for ICWA purposes.

## C. Analysis

¶ 19 We agree that the court's inquiry and notice procedures under ICWA were insufficient.

¶ 20 "The trial court must ask each participant on the record at the beginning of each emergency, voluntary, or involuntary child custody proceeding 'whether the participant knows or has reason to know that the child is an Indian child.'" *People in Interest of K.G.*, 2017 COA 153, ¶ 21 (quoting 25 C.F.R. § 23.107(a)). Yet the court inquired only of father. *See K.G.*, ¶ 25 ("Nor did the court make the required inquiry on the record as to any of the three parents, the guardian ad litem, or the Department."); *see also People in Interest of J.L.*, 2018 COA 11, ¶ 20 ("A written advisement form provided to one participant falls far short of meeting this requirement.").

¶ 21 And at the time the Department sought termination, based on the existing record, the court had "reason to know" the child may have Indian heritage and should have required the Department to

7

send notice to the Jena Band. *See M.V.*, ¶ 44 (parent indicating that children had Indian heritage and were eligible for membership in a federally recognized tribe was "sufficient to give the court reason to know the children were Indian children"); *L.L.*, ¶ 39 ("If a Tribe does not respond to the notice . . . the Department must continue to send the Tribe notices of subsequent proceedings for which notice is required, such as a termination of parental rights proceeding.").

¶ 22      But these errors were harmless.  Grandfather's claim to be a registered member of a Choctaw tribe was the sole basis for believing or having reason to know that the child possibly had Indian heritage.  So when grandfather later clarified that he was enrolled in a federally unrecognized tribe, further notice wasn't required and the previous errors were harmless.  *See People in Interest of Z.C.*, 2019 COA 71M, ¶ 22 ("And because the [tribe] was able to determine that the child was not a member of or eligible for membership in the tribe (albeit in a letter that was not before the juvenile court at the time of the hearing), the error in the juvenile court's finding that the [tribe] received proper notice is harmless."); *People in Interest of S.R.M.*, 153 P.3d 438, 441 (Colo. App. 2006).

8

## III. Ineffective Assistance

¶ 23    Father contends that his trial counsel rendered ineffective assistance by (1) failing to communicate with him; (2) failing to secure his testimony for the termination hearing or later written closing argument, instead proceeding by an "offer of proof"; and (3) not "fully understand[ing] the facts of the case or [father's] position on central issues."  We disagree.

### A.    Standard of Review and Applicable Law

¶ 24    We consider ineffective assistance claims raised for the first time on appeal.  *See People in Interest of A.R.*, 2018 COA 176, ¶ 35 (*cert. granted* Mar. 4, 2019).

¶ 25    In Colorado, a respondent parent's right to appointed counsel in a termination proceeding is secured by statute and not constitutional mandate.  *C.S. v. People in Interest of I.S.*, 83 P.3d 627, 636 (Colo. 2004).  Divisions of this court have recognized that a parent's statutory right to counsel includes the right to effective assistance of counsel.  *People in Interest of S.L.*, 2017 COA 160, ¶ 58.  These divisions have evaluated ineffective assistance of counsel claims by applying the test used in criminal cases — the *Strickland* test.  *People in Interest of C.H.*, 166 P.3d 288, 290-91

9

(Colo. App. 2007) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).  Under *Strickland*, the parent must show two things: (1) counsel's performance was outside the wide range of professionally competent assistance and (2) counsel's errors prejudiced the parent.  *Id.* at 291.  Prejudice requires showing "a reasonable probability that, but for counsel's alleged deficiencies, the outcome of the termination proceeding would have been different."  *S.L.*, ¶ 59.  In evaluating counsel's performance, courts must indulge a strong presumption that counsel's actions might be considered sound trial strategy.  *People v. Phipps*, 2016 COA 190M, ¶ 17.

¶ 26    But a division of this court recently departed from the *Strickland* outcome-determinative prejudice test and adopted a "fundamental fairness" test.  *See A.R.*, ¶ 46 ("We . . . depart from other divisions of this court that have exclusively applied the . . . outcome-determinative test, without considering fundamental fairness, to determine whether a parent was prejudiced by counsel's deficient performance in a termination of parental rights proceeding.").  Under this approach, counsel's performance may

10

also be prejudicial where a judgment is unreliable or fundamentally unfair.  *See id.* at ¶¶ 57, 61.

¶ 27     Chief Justice Directive 16-02, Court Appointments Through the Office of Respondent Parents' Counsel (amended July 1, 2017), provides the practice standards for respondent parent counsel in dependency and neglect cases.  Specifically, respondent parent counsel is required to "[a]dvocate for the client's goals and empower the client to direct the representation and make informed decisions," "[m]eet and communicate regularly with the client well before court proceedings," "[p]resent and cross-examine witnesses, prepare and present exhibits," and "[r]equest the opportunity to make opening and closing arguments."  *Id.* at attach. A, pp. 1-3.

¶ 28     If the parent's allegations aren't sufficiently specific or fail to make a prima facie showing of ineffective assistance, the claim may be denied without further inquiry.  *S.L.*, ¶ 60 (citing *C.H.*, 166 P.3d at 291).  And the failure to establish either *Strickland* prong defeats an ineffective assistance claim.  *Id.* (citing *People in Interest of D.G.*, 140 P.3d 299, 308 (Colo. App. 2006)).

11

¶ 29      Shortly before the termination hearing, the court granted father's request to attend the termination hearing via telephone because he was incarcerated.  At the termination hearing, father's counsel told the court that father wouldn't be able to attend the hearing by telephone and suggested that the hearing be continued because "I know [father] does want to testify and I think he should be allowed to testify in this trial."  The court partially granted counsel's request, continuing the closing arguments and allowing father to file "an affidavit, if any, with the court on or before November 26, 2018."  It gave the parties until December 7, 2018, to file written closing arguments.

¶ 30      On November 26, father's counsel asked the court to extend the time to file father's affidavit.  The court granted the request, but counsel never filed an affidavit.

¶ 31      On December 7, 2018, father's counsel filed a written closing argument, stating, in part, that "[c]ounsel unsuccessfully attempted to schedule a phone call with [father] . . . .  Thus, any information counsel includes regarding [father's] position is essentially an offer of proof."

## C. Analysis

¶ 32    Father argues that the judgment terminating his parental rights must be vacated because counsel's failure to communicate with him "rendered him unable to essentially offer anything more than an 'offer of proof' at the termination stage of [his] case," which "deprived [him] of the equal contest of opposed interests required for fundamentally fair proceedings." Father doesn't allege how or why the result of the proceeding would have been any different had counsel communicated with him, but instead relies solely on the fundamental fairness test adopted in *A.R.*, ¶¶ 57-68.

¶ 33    Because father "has failed to allege facts that would prove prejudice," we conclude that his ineffective assistance of counsel claim fails. *People in Interest of A.G.*, 262 P.3d 646, 652 (Colo. 2011); *see S.L.*, ¶ 65.

¶ 34    In reaching this conclusion, we decline to apply *A.R.*'s fundamental fairness test for establishing prejudice in ineffective assistance of counsel claims, which is contrary to every other division that has addressed the *Strickland* prejudice prong in termination of parental rights cases. *See In re Estate of Becker*, 32 P.3d 557, 563 (Colo. App. 2000) ("[D]ivisions of this court generally

have given considerable deference to the decisions of other [divisions] . . . ."), *aff'd sub nom. In re Estate of DeWitt*, 54 P.3d 849 (Colo. 2002). And we discern no compelling reason to dilute the prejudice test in termination of parental rights cases in favor of *A.R.*'s fundamental fairness test given the latter has its own problems. It is "a requirement whose meaning can be as opaque as its importance is lofty." *A.M. v. A.C.*, 2013 CO 16, ¶ 28 (quoting *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 24 (1981)). Because of its uncertainty and lack of clear benchmarks, we conclude that fundamental fairness isn't a viable alternative to outcome-determinative prejudice.

¶ 35 But we need not delve into the fundamental fairness test's specific shortcomings because ultimately, even if we were to agree with *A.R.*'s reasoning, *see A.R.*, ¶¶ 46-55 ("Fundamental fairness as a focus of *Strickland*'s prejudice inquiry is also simply more suited to the highly discretionary nature of termination proceedings."), we're bound by supreme court precedent. And the supreme court defines "prejudice" in an ineffective assistance of counsel claim in parental termination cases as requiring some evidence showing

"that the result of the termination hearing may have been different" absent counsel's unprofessional errors. *A.G.*, 262 P.3d at 652.

¶ 36    In *A.G.*, our supreme court reviewed a parent's ineffective assistance of counsel claim based on trial counsel's failure to timely request that the trial judge recuse himself in a parental termination proceeding. The court "decline[d] to decide whether *Strickland* applies to a claim of ineffective assistance in a termination hearing," but it held "that if such a claim is cognizable, at the very least, an allegation of prejudice would be required." *Id.* at 651. And it described prejudice by quoting from *Strickland*: "The reviewing court looks at whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694).

¶ 37    The court then analyzed the parent's claim and found that the parent "failed to allege facts that would prove prejudice" because the allegation "[didn't] contain any facts to support a conclusion that the judge was actually biased." *Id.* at 652. It also found that the claim "[a]t most . . . alleged that there may have been an appearance of impropriety[.]" *Id.*

15

¶ 38    The supreme court then addressed the deficiency in the

division's analysis:

> The court of appeals maintained that [the
> parent] suffered prejudice in that, had the
> recusal motion [] been timely, [the parent]
> would have been entitled to a different
> termination hearing before a different judge.
> This conclusion fails to focus on the key
> concern of the prejudice prong: whether the
> *result* of the proceeding would have been
> different.  The court of appeals did not
> conclude, and there has been no evidence
> presented, that the result of the termination
> hearing may have been different if the judge
> had recused himself.

*Id.*  The court concluded that "[w]ithout an assertion of prejudice,

counsel's failure to move for disqualification cannot be the basis of

a valid claim for ineffective assistance of counsel."  *Id.*

¶ 39    Thus, we conclude that *A.G.* requires that a cognizable

ineffective assistance of counsel claim in a termination proceeding

must, "at the very least," allege "there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the

proceeding would have been different."  *Id.* at 651 (quoting

*Strickland,* 466 U.S. at 694).

¶ 40    Father doesn't allege with any specificity how counsel's

performance prejudiced him.  He doesn't allege what evidence

16

counsel should have elicited in his testimony that would have resulted in the proceeding's outcome being different had he testified. *See People in Interest of V.M.R.*, 768 P.2d 1268, 1270-71 (Colo. App. 1989) (deciding that parent's absence from termination hearing was not prejudicial where parent was represented by counsel and personal presence would have had little effect on the proceeding). And he doesn't allege how counsel's further communication with him or fuller understanding of the facts and father's position on central issues would have caused the result of the proceeding to have been different.

¶ 41    Without such an assertion of prejudice, counsel's conduct can't be the basis of a valid claim for ineffective assistance of counsel. *A.G.*, 262 P.3d at 652; *S.L.*, ¶ 60.

*IV.    Conclusion*

¶ 42    The judgment is affirmed.

JUDGE FURMAN specially concurs.

JUDGE NAVARRO specially concurs.

JUDGE FURMAN, specially concurring.

¶ 43    While I agree that father did not allege with enough specificity how counsel's deficient performance prejudiced him, I write separately to address the majority's view that we should apply *Strickland*'s criminal prejudice inquiry to an ineffective assistance of counsel claim in a civil dependency and neglect case.  I would follow the division in *A.R.* and apply fundamental fairness as the standard by which we evaluate prejudice in parents' ineffective assistance of counsel claims.  *See People in Interest of A.R.*, 2018 COA 176, ¶¶ 64-65 (*cert. granted* Mar. 4, 2019).

¶ 44    The majority concludes that the supreme court's holding in *People in Interest of A.G.*, 262 P.3d 646, 651 (Colo. 2011), requires, at a minimum, that we apply *Strickland*'s "outcome-determinative" prejudice inquiry to respondent parents' ineffective assistance of counsel claims.  I respectfully disagree.  True, the court applied this inquiry to such a claim.  *Id.*  But, as I read *A.G.*, this was by example because the court in *A.G.* explicitly declined to "decide whether *Strickland* applies to a claim of ineffective assistance in a termination hearing."  *Id.*  If I am misreading *A.G.*, I respectfully ask our supreme court, for the reasons that follow, to reconsider its

holding regarding the prejudice inquiry. The division in *A.R.* did not directly address the shortcomings of making such an inquiry, so I do so here.

¶ 45 The United States Supreme Court in *Strickland v. Washington* set out the now-familiar test for evaluating a criminal defendant's ineffective assistance of counsel claim. 466 U.S. 668 (1984). A defendant making this claim must first show "that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. A defendant then must show "that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* The court explained that "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. This is referred to as the "outcome-determinative" test.

¶ 46 Without analysis, divisions of this court have adopted the *Strickland* outcome-determinative test to evaluate ineffective

assistance claims in civil termination of parental rights proceedings. *See People in Interest of V.M.R.*, 768 P.2d 1268, 1270 (Colo. App. 1989) (adopting, without analysis, the outcome-determinative test for prejudice in ineffective assistance of counsel claims); *see also People in Interest of C.H.*, 166 P.3d 288, 291 (Colo. App. 2007) (same); *People in Interest of D.G.*, 140 P.3d 299, 308 (Colo. App. 2006) (same). Under this test, a parent bringing an ineffective assistance claim must show "a reasonable probability that, but for counsel's deficient performance, the outcome of the hearing would have been different." *D.G.*, 140 P.3d at 308.

¶ 47 But the United States Supreme Court cautioned against applying *Strickland*'s prejudice inquiry in a mechanical fashion. *Weaver v. Massachusetts*, 582 U.S. ___, ___, 137 S. Ct. 1899, 1911 (2017) (citing *Strickland*, 466 U.S. at 694, 696). The Court recognized that under *Strickland*,

- "the concept of prejudice is defined in different ways depending on the context in which it appears";
- "the prejudice inquiry is not meant to be applied in a 'mechanical' fashion"; and

- "when a court is evaluating an ineffective-assistance claim, the ultimate inquiry must concentrate on the 'fundamental fairness of the proceeding.'"

*Id.* (quoting *Strickland*, 466 U.S. at 696).

¶ 48    I believe that evaluating ineffective assistance of counsel claims in civil termination of parental rights proceedings calls for a more flexible prejudice inquiry — one that concentrates on the "fundamental fairness" of the proceeding.  I reach this conclusion for two reasons: (1) there are essential differences between criminal trials and civil termination of parental rights proceedings; and (2) since the landmark decision in *Santosky v. Kramer*, 455 U.S. 745 (1982), the United States Supreme Court and our supreme court have consistently used "fundamental fairness" as the benchmark for evaluating the adequacy of procedures afforded to parents in termination of parental rights proceedings.  I believe errors of counsel should be measured by their effect on whether a parent received a fundamentally fair termination of parental rights hearing. *See A.R.*, ¶ 57.  I will refer to this as the "fundamental fairness" test.

I.    Essential Differences

¶ 49    Criminal trials and civil termination of parental rights hearings require the fact finder to answer profoundly different questions.

¶ 50    In criminal trials, the judge or jury must decide whether the prosecution proved that the defendant committed the charged crime at a specific time and place.  *See In re Winship*, 397 U.S. 358, 364 (1970).  If it finds the prosecution proved this beyond a reasonable doubt, it must find the defendant guilty.  *Leonard v. People*, 149 Colo. 360, 372, 369 P.2d 54, 61 (1962).  In other words, it does not have discretion to find otherwise.  *Id.*

¶ 51    Unlike criminal trials, a typical civil termination of parental rights hearing requires the judge to conduct a multifactorial, totality-of-the-circumstances evaluation of a parent's fitness, or whether a parent is likely to become fit within a reasonable time, based primarily on the parent's compliance with an appropriate treatment plan over many months.  § 19-3-604(1)(c)(I)-(III), C.R.S. 2019.  Colorado's complex statutory scheme provides a nonexhaustive list of factors the judge may consider when conducting this evaluation.  *See* § 19-3-604(2).  But that does not end the judge's analysis.

¶ 52    Even if the judge determines that the Department or guardian ad litem proved parental unfitness and other criteria by clear and convincing evidence, the judge retains discretion to decide whether to terminate parental rights.  *See* § 19-3-604(1) ("The court *may* order a termination of the parent-child legal relationship upon the finding by clear and convincing evidence of any one of the following: . . . .") (emphasis added).  By using the word "may," the General Assembly gave the judge discretion to deny termination even when the statutory criteria are met.

¶ 53    Factors that may influence the judge's decision to terminate parental rights include whether a less drastic alternative exists and the "physical, mental, and emotional conditions and needs of the child."  § 19-3-604(3); *People in Interest of M.M.*, 726 P.2d 1108, 1122 (Colo. 1986).  Unlike in a criminal case, in which the fact finder must choose between only two possible outcomes — guilty or not guilty of a specifically defined offense at a fixed point in time — the juvenile court's decision is not a binary choice of whether a parent is fit or unfit, able or unable to care for a child on the final day of the termination hearing.  Instead, for example, a juvenile court may conclude that, even though termination is one legally

23

available option, an allocation of parental responsibilities to a relative would better serve a particular child's needs.

¶ 54 These differences between criminal trials and civil termination hearings bear on the propriety of applying the outcome-determinative test in each context. In criminal trials, a defendant mounting an ineffective assistance claim must show that errors of counsel "actually had an adverse effect on the defense." *Strickland*, 466 U.S. at 693. An outcome-determinative test in a criminal case, then, can properly focus on "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

¶ 55 In contrast, the prejudicial effect of counsel's errors on the judge's parental fitness determination is difficult, if not impossible, to quantify because a cold record seldom shows how any one or more of the factors may have dealt the deciding blow in the fitness determination. And, even if we could quantify this, the fitness determination is not the only factor the judge must consider. Thus, weighing the prejudicial effect of counsel's errors on the decision to terminate parental rights only results in speculation.

¶ 56    Two hypothetical cases illustrate these key differences and show why I believe an ineffective assistance of counsel claim in a civil termination of parental rights proceeding should not include an outcome-determinative inquiry.

¶ 57    Imagine that the prosecution charges a defendant with second degree burglary. At trial, defense counsel fails to call two of the defendant's friends, who would have credibly testified that the defendant was with them in another town on the day of the burglary. Without this evidence, the jury finds the defendant guilty, and he is convicted of the offense.

¶ 58    Now imagine the defendant brings an ineffective assistance of counsel claim. He must show that (1) his counsel's performance was outside the wide range of professionally competent assistance and (2) he was prejudiced by counsel's errors. *Strickland*, 466 U.S. at 687. To satisfy the "prejudice" prong, the defendant must show there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

¶ 59    The hypothetical defendant can show that had his lawyer called his friends as witnesses, there is a reasonable probability the

jury would not have found that he committed the burglary. *See* § 18-4-204, C.R.S. 2019; *Leonard*, 149 Colo. at 372, 369 P.2d at 61. That is, the postconviction court can assess how the friends' testimony would have affected the verdict because it would have shown the defendant was not at the scene of the crime.

¶ 60    Contrast this hypothetical with a civil termination of parental rights proceeding.

¶ 61    Imagine a mother struggles with substance abuse. Her young child has been placed out of her home for a year, and she is now facing termination of her parental rights. At the termination hearing, the judge hears testimony from mother's caseworker that mother has attended some, but not all, of her required substance abuse treatment sessions; that she has maintained sobriety for some of the time her child has been placed outside the home; and that she has missed visits with her child. The caseworker offers her expert opinion that terminating mother's parental rights is in the best interests of the child.

¶ 62    Now imagine that mother's counsel failed to call her substance abuse therapist as a witness at the termination hearing. The therapist would have credibly testified that mother was the most

26

successful client he had ever worked with, that she has been sober for six months, and that she will almost certainly maintain sobriety going forward. Without this evidence, the judge terminates mother's parental rights, finding, among other things, that the Department of Human Services and the child's guardian ad litem proved by clear and convincing evidence that mother did not reasonably comply with her treatment plan, that she is unfit, and that she is unlikely to become fit within a reasonable time. *See* § 19-3-604(1)(c)(I)-(III).

¶ 63     Now suppose that mother brings an ineffective assistance of counsel claim on direct appeal.

¶ 64     I believe that mother would be hard pressed to show that the outcome would have been different. Under the outcome-determinative test, she may be able to show that her therapist's testimony would have been highly relevant to whether she reasonably complied with her treatment. But an appellate court could only speculate on what effect this evidence might have had on the outcome. This is so because we have no way to determine whether the judge would have maintained his or her evaluation of mother's fitness or whether mother would become fit within a

reasonable time based on other factors, such as mother's missed visits. And fitness is not the outcome. The outcome is the judgment terminating parental rights. Parental fitness is only one factor the judge must consider when deciding whether to terminate parental rights. The judge must also consider facts *external* to the parent, including the physical, mental, and emotional conditions and needs of the child and whether there are any less drastic alternatives. § 19-3-604(3); *M.M.*, 726 P.2d at 1122.

¶ 65     Our supreme court has made clear that an appellate court may not substitute its own judgment for that of the juvenile court. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50, 253 (Colo. 2010) (citing *People in Interest of C.A.K.*, 652 P.2d 603, 613 (Colo. 1982)). But, in my view, this kind of second-guessing is precisely what the outcome-determinative test requires appellate courts to do in termination of parental rights cases. *See D.G.*, 140 P.3d at 308 (explaining that, to establish prejudice under *Strickland* "a parent must show that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the hearing would have been different").

¶ 66    In sum, it is difficult, if not impossible, for a parent to show —

and an appellate court to assess — prejudice under a mechanical

application of *Strickland*'s outcome-determinative test.  *See* Susan

Calkins, *Ineffective Assistance of Counsel in Parental-Rights*

*Termination Cases: The Challenge for Appellate Courts*, 6 J. App.

Prac. & Process 179, 215 (2004) ("In almost all of the cases in which

*Strickland* is applied, either expressly or impliedly, the courts

decline to find ineffectiveness.").

¶ 67    For this reason, I believe that applying the outcome-

determinative test in the parental rights context is at odds with the

legislature's guarantee that respondent parents shall have the "right

to be represented by counsel at every stage of the proceedings."

§ 19-3-202(1), C.R.S. 2019.  If Colorado courts mechanically apply

an outcome-determinative test, which poses an almost

insurmountable hurdle for parents alleging ineffective assistance of

counsel, I fail to see how parents' statutory right to effective counsel

can be protected.  *See In re Geist,* 796 P.2d 1193, 1200 (Or. 1990)

("The statutory right to adequate trial counsel may prove illusory if

there is no procedure for review of claims of inadequate counsel.").

¶ 68    In my view, it makes little sense to stretch *Strickland* beyond its Sixth Amendment, criminal, origins.

## II.    Fundamental Fairness

¶ 69    Instead, I believe the prejudice inquiry must concentrate on the "fundamental fairness" of the proceeding. *See A.R.*, ¶ 56. The fundamental fairness test asks whether deficient performance by a respondent parent's counsel "rendered the proceeding fundamentally unfair or the result of the proceeding unreliable." *Id.* at ¶ 11. In my view, this test better comports with the flexible, discretionary nature of dependency and neglect proceedings. *See* § 19-3-604(1). After all, dependency and neglect proceedings are civil cases, not criminal cases, implicating parents' due process rights to the care, custody, and control of their child. And fundamental fairness has long been the benchmark by which the United States Supreme Court and our supreme court have evaluated the adequacy of procedural protections afforded to parents in termination of parental rights proceedings. *See Santosky*, 455 U.S. at 753-54; *People in Interest of A.M.D.*, 648 P.2d 625, 636 (Colo. 1982) (adopting clear and convincing evidence as the standard of proof in termination of parental rights hearings

because *Santosky* requires "that the State's procedure must be fundamentally fair"); *see also People in Interest of J.W. v. C.O.*, 2017 CO 105, ¶¶ 34-35 (considering whether "the trial court's failure to enter a written adjudication order" before terminating parental rights impaired "the fundamental fairness of the proceedings"); *A.M. v. A.C.*, 2013 CO 16, ¶ 38 ("[F]ull participation by foster parent intervenors does not undermine the fundamental fairness of the termination hearing."); *B.B. v. People*, 785 P.2d 132, 136-37 (Colo. 1990) (explaining that the purpose of the "complex statutory scheme" governing termination proceedings is to "accord fundamental fairness to all parties").

¶ 70    The majority concludes that the fundamental fairness test is "opaque" and has problems with "uncertainty and lack of clear benchmarks." *Supra* ¶ 34 (quoting *A.M.*, ¶ 28).  I respectfully disagree.

¶ 71    *A.R.* outlined two concrete ways a parent may answer a prejudice inquiry.  *See A.R.*, ¶¶ 64-65.

¶ 72    First, a parent could claim that his counsel's deficient performance impaired a significant procedural safeguard, such as the right to notice, the right to a separate hearing, the right to proof

by clear and convincing evidence, and the right to appeal. *Id.* at ¶ 64; *see A.M.*, ¶¶ 29, 38 (recognizing the significant protections Colorado law provides to respondent parents under the "fundamental fairness" standard). To illustrate, a parent could allege that his counsel rendered deficient performance by not objecting to the Department of Human Services explaining what evidence it *would* offer to the court without actually *presenting* that evidence at a termination of parental rights hearing. (This unfortunately common procedure is often called an "offer of proof." *See A.R.*, ¶¶ 89-96 (discussing "offer of proof").) The parent could show prejudice by claiming he was denied the right to proof by clear and convincing evidence at the termination of parental rights proceeding, as required under section 19-3-604(1) and *A.M.D.*, 648 P.2d at 636.

Second, a parent could claim that her counsel's deficient performance prevented the juvenile court from receiving essential information favorable to the parent relating to section 19-3-604's termination criteria. *A.R.*, ¶ 65. To illustrate, our earlier hypothetical mother could allege that her counsel rendered deficient performance by failing to call her therapist as a witness. Recall that

32

the therapist would have credibly testified that mother successfully engaged in her treatment plan and was sober for the six months before the termination of parental rights hearing. The hypothetical mother could show prejudice by claiming that the therapist's testimony would have provided essential information relating to her compliance with her treatment plan and fitness to parent. *See* § 19-3-604(1)(c)(I), (II); *A.R.*, ¶ 65. If she makes such a showing, the juvenile court, on remand, would evaluate its termination judgment after hearing the therapist's testimony.

¶ 74 For all these reasons, I believe that fundamental fairness is the better test for evaluating whether errors by a parent's counsel under Colorado's complex statutory scheme deprived the parent of a fundamentally fair termination of parental rights hearing.

¶ 75 I now turn to the present case.

¶ 76 Father contends on appeal that his counsel rendered ineffective assistance for the following reasons:

- His attorney did not arrange for father's attendance at the termination hearing by telephone.

- His attorney did not arrange for father to testify.

- His attorney was unclear about many of the facts central to father's case.

- His attorney was uncertain about father's communications with his son.

- His attorney did not know whether father's condition had improved during the proceedings.

¶ 77     Applying the fundamental fairness test, I would conclude father has not alleged with enough specificity how counsel's deficient performance prejudiced him.  I reach this conclusion for two reasons: (1) father does not allege that his counsel's deficient performance impaired a significant procedural safeguard and (2) he does not claim that his counsel's deficient performance prevented the court from receiving essential information favorable to him relating to section 19-3-604's termination criteria.  *See A.R.*, ¶ 66.

¶ 78     I conclude with one last observation.  Permitting a parent to bring an ineffective assistance claim on direct appeal is the most expedient way to handle these claims, because it allows a reviewing court to consider all errors that could potentially disrupt the finality of a termination judgment in one step.  *See* Calkins, 6 J. App. Prac.

& Process at 207 ("A direct appeal is likely to be faster than either a post-judgment motion or a habeas proceeding in most cases.").

JUDGE NAVARRO, specially concurring.

¶ 79　　I join Judge Hawthorne's opinion in full.  I write separately to say that I also agree with Judge Furman that father's assertion of prejudice from his counsel's allegedly deficient performance fails the fundamental fairness test adopted in *People in Interest of A.R.*, 2018 COA 176, ¶ 35 (*cert. granted* Mar. 4, 2019).  Accordingly, under either test for assessing prejudice from his counsel's performance, father's claim does not succeed.